UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| SHANA COTTONE, | : | |
|     Plaintiff | : | |
| | : | |
| | : | |
|     v. | : | C.A. No. 1:24-cv-13233-GAO |
| | : | JURY TRIAL DEMANDED |
| | : | |
| CITY OF BOSTON, by and Through | : | |
| Its Treasurer, Ashley Groffenberger; and | : | |
| MICHELLE WU, | : | |
|     Defendants. | : | |

**AMENDED COMPLAINT**

Pursuant to Rule 15(a)(1)(B) and 15(a)(2) of the Federal Rules of Civil Procedure, and by the written consent of Defendants, Plaintiff Shana Cottone hereby amends the Complaint filed on December 31, 2024 (ECF Doc. No. 1) for first amendment retaliation and discrimination action against her former employer the City of Boston and its Mayor, Michelle Wu, for violations of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; and Mass. Gen. Laws c. 151B.  Plaintiff alleges the following:

**The Parties**

1.    Plaintiff SHANA COTTONE ("Cottone") is an individual, female person of legal age, who, at all times relevant to this action, was a member of the Boston Police Department (the "BPD"), an employee of the City of Boston, and a resident of the state of Massachusetts. Cottone is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983; and an "employee" within the meanings of 42 U.S.C. § 2000e(f) and Mass. Gen. Laws c. 151B § 1(6).

2.    Defendant CITY OF BOSTON is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and is being sued by and through its Treasurer Ashley Groffenberger.  At all times relevant to this matter, the City of Boston managed, maintained, operated, and controlled the Boston Police Department headquartered at 1 Schroeder Plaza, Boston, MA 02120 where it employed Cottone.  At all times relevant to this action, Defendant City of Boston was an "employer" within the meanings of 42 U.S.C. § 2000e(b) and Mass. Gen. Laws c. 151B § 1(5), and a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

3.    Defendant MICHELLE WU ("Mayor Wu") is an individual, female person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as its Mayor.  At all times relevant to this action, Defendant Wu exercised control over the terms and conditions of Cottone's employment and had the authority to terminate Cottone's employment without the need for approval from the Boston City Council.  At all times relevant to this action, Defendant Wu was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in her official capacity as Mayor of the City of Boston, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

## Jurisdiction and Venue

4.    This Court has federal question jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 and 42 U.S.C. § 2000e et seq.

5.    This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claims that they form part of the same case or controversy.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants have offices, conduct business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred herein.

7.    Personal jurisdiction exists over Defendants in that they maintain sufficient minimal contacts in the Commonwealth of Massachusetts.  Specifically, Defendants engage in systematic and continuous activity in the Commonwealth of Massachusetts.  Moreover, a substantial portion of the actions complained of herein occurred in the Commonwealth of Massachusetts.

## Administrative Procedures

8.    Prior to instituting the action, Cottone filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") for violations of Mass. Gen. Laws c. 151B (the "MCAD administrative charge"), which was simultaneously filed with the Equal Employment Opportunity Commission (the "EEOC") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (the "EEOC administrative charge").

9.    On October 2, 2024, the EEOC issued a Notice of Right to Sue Letter.

## Factual Allegations

### Cottone's employment with the Boston Police Department

10.    In May 2008, Cottone began working  as a police officer for the Boston Police Department (the "BPD").

11.    In July 2017, Cottone was promoted to Sergeant.

12.    During Cottone's career, she received numerous awards and citations.

13.    During the 2013 Boston Marathon bombing, Cottone saved two critically-injured amputees and received the "Life Saving Valor Award" and the "Courage Award" from the Massachusetts Association of Women in Law Enforcement.

14.    As a result of her heroics during the 2013 Boston Marathon bombing, Cottone was featured in dozens of print publications.

15.    In 2015, Cottone received a "Commissioner Commendation" for running into a burning building to rescue occupants.

16.    During Cottone's career, she often mentored and counseled peers on personal issues.

17.    Cottone was the first BPD officer to serve as a "co-responder," pairing police officers with social workers to treat root causes of emergency 911 calls and provide services to mentally ill, homeless, and substance abuse addicts.

### The City of Boston's mandatory COVID-19 vaccine requirement

18.    In August 2021, then-Boston Mayoral candidate Defendant Wu publicly announced her intention to implement a COVID-19 vaccine mandate, requiring all City of Boston employees, including police officers, to submit to COVID-19 vaccination or risk termination of employment for refusing to do so (the "COVID-19 vaccine mandate").

19.    Cottone holds a sincerely-held religious belief rooted in her Christian faith, which she sincerely believes prevents her from receiving man-made vaccines like the COVID-19 vaccine.

20.    On January 14, 2022, Cottone filed a seventeen-page request for a religious exemption informing her employer in writing that receiving the COVID-19 vaccine conflicts with her sincerely-held religious beliefs.

21.    Cottone became a vocal leader and President of the advocacy group "Boston First Responders United," which assisted City of Boston employees in submitting religious exemptions against the vaccine mandate.

22.    At all times relevant to this matter, Boston First Responders United had a substantial participant base.

23.    As President of Boston First Responders United, Cottone would regularly send group emails to City of Boston employees.

24.    Cottone's direct supervisor, Captain Darrin Greeley ("Greeley") acknowledged her position opposing the COVID-19 vaccine mandate, exhibited hostility towards Cottone's protected activities, and criticized her advocacy efforts and religious beliefs.

25.    In early December 2021, Cottone wrote on the windows of her personal vehicle:  "No Vax Mandate, No Vax Passport."

26.    When Greeley saw what Cottone had written on her vehicle, he demanded that she move it off the public roadway and park it behind the police station and that she was being "political."

27.    In response, Cottone told Greeley that the forced, man-made COVID-19 vaccination violated her firmly-held religious beliefs.

28.    Greeley also told Cottone on several occasions in the presence of others that she was "stupid for not taking the vaccine" or words to that effect upon which Cottone told Greeley that the forced, man-made COVID-19 vaccination violated her firmly-held religious beliefs.

29.    On December 22, 2021, Greeley documented negative views toward Cottone's lawful speech, publicly disparaged her beliefs, and ridiculed her for her religious objections to the vaccine.

30.    Greeley wrote in a report:  "Sgt. Cottone is also the leader of a first responders' group that is opposed to the vaccine mandate.  She has been very vocal to all officers citywide and at roll calls.  She continuously holds officers over at roll call and advocates against the vaccine."

31.    Beginning in early 2022, Cottone and members of Boston First Responders United began protesting regularly at Defendant Wu's personal residence in Rosindale, Massachusetts.

32.     On or about January 2, 2022, Cottone began the process of initiating a charge of discrimination against her employer with the Massachusetts Commission Against Discrimination (the "MCAD") for discrimination on the basis of religion (the "MCAD complaint").

33.     Cottone was very vocal in the workplace about the MCAD complaint she had initiated, discussing it openly with her co-workers.

34.     Within days, on January 8, 2022, the BPD retaliated against Cottone by placing her on administrative leave.

35.     On March 4, 2022, Defendant Wu appeared on the Dan Rea Radio Show and referred to Boston First Responders United as a "right wing extremist group," directly addressing Cottone's protests at her residence and criticizing their timing and methods.

36.     During the radio show, Cottone called in to speak to Defendant Wu, who acknowledged that she knew Cottone and had observed her protesting at her personal residence.

37.     Defendant Wu also chided Cottone for protesting too early in the morning stating:

   **Come to City Hall, come on the weekends, during the day . . . Come later in the day . . . twelve hours available for all the drum banging and whistling and shouting horrible things on megaphones that you all do . . . Fine . . . But, let my neighbors and my family and everyone across the City have that precious sleep time.**

38.     Cottone later learned that Defendant Wu's administration had targeted her and other COVID-19 vaccine protesters as "vocal critics" of the Mayor in an email sent to the BPD – a so-called enemies list – consisting of fifteen individuals, including Cottone.

39.     In April 2022, Cottone received a notice to appear before a magistrate judge in West Roxbury District Court in a criminal complaint for disturbing the peace at a protest on April 1, 2022 at Defendant Wu's personal residence in which Cottone was alleged to have used a bull horn in violation of a city noise ordinance.

40.     Defendant City of Boston elected to charge Cottone with a crime for disturbing the peace even though the ordinance only provided for civil penalties.

41.     Furthermore, there were other protesters who used a bull horn at these protests, however, upon information and belief, Cottone was the only protester charged with a crime.

42.     The charges against Cottone were ultimate dismissed for lack of probable cause, however, Cottone was forced to hire a private attorney at a significant expense to fight the bogus charge.

43.    Cottone later discovered that Greeley had spoken with Mayor Wu's driver, Sgt. Det. Cary Chin ("Chin") and that Chin instructed Greeley through Wu to pursue a criminal complaint against Cottone for "reckless driving" and "disturbing the peace."

44.    As a result of Chin's directive through Defendant Wu, Greely directed Sgt. Stephen O'Brien ("O'Brien") to effectuate the criminal charges against Cottone.

45.    On April 6, 2022, Cottone received an email from Sean P. Murphy ("Murphy"), the Clerk Magistrate in West Roxbury District Court (where the charges against Cottone were filed), stating that he had reached out to the BPD and it indicated that a magistrate hearing was how the department wanted to proceed.

46.    Murphy's email supports Cottone's allegation that the BPD treated her more harshly than other individuals who were accused of violating the noise ordinance.

47.    Cottone also learned that O'Brien testified at a hearing that he never observed Cottone using a bull horn, but rather, he only heard a voice that sounded like hers.

48.    O'Brien also testified that the new ordinance called the "Targeted Residential Picketing Ordinance" <u>precluded</u> any criminal penalties and only provided for civil fines.

**<u>The BPD opens six Internal Affairs investigations of Cottone in an attempt to retaliated against her for her protected activity.</u>**

49.    Emails obtained through public records show Defendant Wu's senior advisors directly urging severe disciplinary actions against Cottone, further underscoring discriminatory and retaliatory animus linked directly to her protected advocacy and speech.

50.    In 2021 and 2022, the BPD opened six Internal Affairs investigations of Cottone for the following alleged infractions:

**<u>IAD Case No. 2021-0455</u>:**
- **<u>Neglect of Duty (Rule 102 § 04)</u>.**  The BPD alleges Cottone left her assigned area without obtaining proper supervisory coverage to attend roll call.
    - Cottone contends that a police officer named Tom Leahy agreed to cover for her.

- **<u>Failure to Follow Directives and Orders (Rule 102 § 08)</u>.**  The BPD alleges that despite clear instructions prohibiting recording at roll call, Cottone recorded Mayor Wu's remarks and continued even after being instructed to stop.
    - Cottone contends she was not aware of said directive and proceeded to record the roll call, which was attended by approximately 100 City of Boston employees, many of whom were also recording Defendant Wu.

**IAD Case No. 2022-0004:**
- **Neglect of Duty and Conduct (Rules 102 § 04 & 03).** The BPD alleges Cottone initially failed to assign officers to Mayor Wu's residence protection detail, made disparaging comments about providing protection to Mayor Wu, and exhibited confrontational and accusatory behavior towards her peers and supervisors.
  - Cottone contends this was a simple oversight and that her comments were intended to be humorous and not taken seriously.

**IAD Case No. 2022-0014:**
- **Conformance to Laws and Conduct (Rules 102 § 35 & § 03).** The BPD alleges that, while off-duty, Cottone refused to leave the Penguin Pizza establishment after violating COVID-19 vaccine mandates, was disrespectful and discourteous to responding officers and establishment staff, and mocked and berated officers publicly.
  - Cottone contends that her actions did not violate laws because the mask and vaccine requirements were mandates rather than enforceable laws applicable to individuals.

**IAD Case No. 2022-0015:**
- **Conduct, Statement of Opinion, and Conformance to Laws (Rules 102 §§ 03, 19, 35).** The BPD alleges that, while off-duty, Cottone engaged in confrontational and disrespectful interactions at Pizzeria Regina, refused mask and vaccine requirements, was verbally abusive to officers and restaurant staff, and openly criticized city governance and fellow officers publicly, creating significant disruption.
  - Cottone contends that her actions did not violate laws because the mask and vaccine requirements were mandates rather than enforceable laws applicable to individuals. Cottone also contends that he comments to police officers involve matters of a public concern that is protected speech.

**IAD Case No. 2022-0103:**
- **Conformance to Laws, Conduct, Respectful Treatment (Rules 102 §§ 35, 03, 09).** The BPD alleges Cottone participated in loud, disruptive protests outside Mayor Wu's residence, violating noise ordinances and interfering disrespectfully with officers attempting to manage the situation.
  - Cottone disputes these allegations.

**IAD Case No. 2022-0136:**
- **Conduct and Conformance to Laws (Rules 102 §§ 03, 35).** The BPD alleges that despite warnings about the Boston Targeted Residential Picketing Ordinance, she continued protesting and yelling through amplification devices, followed Mayor Wu's vehicle, and was confrontational with fellow officers enforcing the law.
  - Cottone challenges the allegations of violating noise ordinances disputing the accuracy of distance and impact measurements.

51.    On March 13, 2023, the Defendant City of Boston terminated Cottone's employment for violation of the following BPD rules:

- **Rule 102 § 3 – Conduct**
  - Engaging in confrontational and disrespectful behavior towards fellow officers, supervisors, and civilians.
- **Rule 102 § 4 – Neglect of Duty**
  - Failing to properly assign security coverage at Mayor Wu's residence.
- **Rule 102 § 8 – Directives and Orders**
  - Disregarding direct instructions not to record Mayor Wu's public statements during a roll call.
- **Rule 102 § 9 – Respectful Treatment**
  - Making disrespectful and inappropriate comments toward fellow officers, including Sergeant O'Brien.
- **Rule 102 § 19 – Statement of Opinion**
  - Publicly criticizing and ridiculing departmental personnel and policies in a manner disruptive to department discipline.
- **Rule 102 § 35 – Conformance to Laws**
  - Violating laws and ordinances during protests, specifically noise ordinances (use of amplification device exceeding allowed limits).

52.    However, despite the BPD's trumped-up allegations against Cottone, dozens of other officers who committed significantly more severe offenses have consistently received far less severe disciplinary actions, highlighting the retaliatory and pretextual nature of the charges against her.  For example:

- Case IAD2021-0269:  Officer C.S. engaged in unauthorized excessive force by kicking a restrained individual in the head.
- Case IAD2021-0264:  Officer conducted an unlawful vehicle search without a warrant.
- Case IAD2021-0259:  Officer B.X. associated socially with known gang members in violation of policy.
- Case IAD2021-0256:  Officers improperly handcuffed and publicly humiliated a minor without cause.
- Case IAD2021-0280:  Officer aggressively threw an unresisting female to the ground, causing injuries.
- Case IAD2021-0251:  Officers were accused of brutality causing significant chronic health problems.
- Case IAD2021-0248:  Officer D.W.W.S. unjustifiably threatened an individual with a firearm.
- Case IAD2021-0255:  Officers refused a victim's request to file a police report and treated her disrespectfully.
- Case IAD2018-0186:  Officer C.B. posted inappropriate content on social media seen by a Suffolk County ADA, resulting in only a one-day suspension.

- <u>Case IAD2018-0225</u>:  Officer M.V.A. improperly interfered at an active crime scene off-duty and faced no immediate severe consequences.
- <u>Case IAD2018-0230</u>:  Officer J.G. intervened improperly in an active police investigation while intoxicated and armed, receiving only a three-day suspension.
- <u>Case IAD2018-0284</u>:  Officer M.R.S. was arrested for operating under the influence (OUI) after causing an accident, yet faced minimal discipline.  The responding officer was untruthful about being close enough to the officer to smell alcohol.
- <u>Case IAD2018-0363</u>:  Lt. J.R.H. circulated racially insensitive messages among colleagues and received only a written reprimand.
- <u>Case IAD2018-0454</u>:  Officer P.M.B. got into an altercation while off-duty at a fitness center and told a woman: "I hope your husband or boyfriend beats you and puts you into your place because women have no business speaking to their superiors like this." Upon information and belief, this officer received an oral reprimand.
- <u>Case IAD2019-0417</u>:  Officer J.L. engaged in aggressive and racially charged confrontations at a school, yet experienced delayed disciplinary action.
- <u>Case IAD2020-0464</u>:  Detective R.M.T. fled from police, committed traffic violations, and resisted arrest but retired without significant disciplinary action.
- <u>Case IAD2021-0348</u>:  Off duty Officer G.H. involved in motor vehicle accident while smelling of alcohol.  Responding officer R.P.E. was untruthful in his reporting of said incident.
- <u>Case 2021-0337</u>:  Off duty Office G.H. was involved in road rage incident involving allegations of assault and battery on a civilian.
- <u>IAD 2021-0304</u>:  Recruit Officer J.A. was observed to be associating with a known drug suspect off duty.
- <u>IAD 2021-0278</u>:  Officer L.W. used excessive force and procured a police report that was contradictory to Body Worn Camera footage.
- <u>IAD 2021-0275</u>:  Officer M.R. engaged in excessive force by pointing a firearm at a witness.
- <u>IAD 2021-0293</u>:  Officer T.A. created a hostile work environment by engaging in sexist language around female police officers.
- <u>IAD 2021-0315</u>:  Officer C.J. used excessive force on a civilian complainant.
- <u>IAD 2021-0347</u>:  Officer M.M., while intoxicated off duty, harassed a female employee at a bar, following her around and using his body to block her egress.
- <u>IAD 2021-0346</u>:  Officer C.P. engaged in excessive force by grabbing a civilian by his throat and dragging him.
- <u>IAD 2021-0359</u>:  Captain C.H. followed a female police officer who had complained about him during an official court testimony where her attorney requested information related to domestic violence charges against Captain C.H over the course of his career.
- <u>IAD 2021-0385</u>:  Officer T.C. fired his service weapon and failed to report it.
- <u>IAD 2021-0388</u>:  Probationary Police Officer D.C. was found passed out and intoxicated on the street near Fenway Park.
- <u>IAD 2021-0408</u>:  Officer N.P. refused to wear a mask while working a polling place, stating it was against his religious beliefs.
- <u>IAD 2021-0406</u>:  Officer G.H., while off duty, operated an unregistered and uninsured motorcycle while under the influence of alcohol resulting in a serious crash.

- <u>IAD 2021-0412</u>:  Officer S.O. reported to work under the influence of alcoholic beverage.
- <u>IAD 2021-0422</u>:  Officer S.S.C. failed to follow numerous direct orders and posted incendiary messages on social media disparaging his supervisor. Officer also abandoned his post and went home early without notifying a supervisor.
- In 2019, Captain T.C. physically assaulted his wife and led police in his hometown on a vehicle chase as he attempted to evade arrest.
- In 2021, Sergeant A.J. was arrested for possession methamphetamine and amphetamine in New Hampshire.
- In 2022, Police Officer C.L. was arrested for operating a motor vehicle under the influence of drugs.
- In 2023, Officer R.L. was caught stealing money from a found wallet and was given a ninety day suspension. She was subsequently promoted to Sergeant.
- In 2022, Officer J.K. was arrested for domestic violence against a family member.
- In 2010, Officer. B.D. was fired for being an accessory after murder and ultimately was reinstated.
- Sergeant M.A. was arrested for operating a motor vehicle under the influence of alcohol in Maine.
- Sergeant P.B. was arrested in Boston by Massachusetts State Police for operating under the influence of alcohol.
- Sergeant P.B. was arrested for operating a motor vehicle under the influence of alcohol.
- In 2020, Detective S.D. was arrested for a domestic violence incident.
- Lieutenant J.E. was arrested twice for operating a motor vehicle under the influence of alcohol.
- In 2014 Sergeant J.M. was charged with stalking a female citizen and was given a four month suspension only.
- Sergeant C.M. was accused of sexual assault of a civilian in 2005, and investigated for bragging about running protestors over with his department cruiser during the 2020 riots resulting in no discipline.
- Officer J.R. was arrested in Las Vegas
- A female officer at Area B-2 was caught secretly recording fellow officers and did not face charges.
- In 2018, members of the Youth Violence Strike Force drank alcoholic beverages at the police station. One officer, D.C. left the gathering under the influence resulting in a serious motor vehicle accident. The other officers who also drank at the police station with him were only given three day suspensions. Some of them went on to become promoted to Sergeant.
- In 2021, Sergeant Brian Dunford was arrested for domestic violence. He was later promoted to Lieutenant.
- Sergeant C.C. failed his drug test, but was not terminated.
- Sergeant K.M. failed his drug test and was subsequently promoted to Lieutenant.
- Officer R.A. lied to internal affairs investigators regarding his actions during a shooting of police officers. He was allowed to give a second interview, recanting his original statements.
- Sergeant E.G.G. violated the Boston Trust act but was not disciplined.

- Officer S.O. was arrested for operating under the influence of alcohol in Weymouth, MA.

53.  Additionally, officers Kim Tavares ("Tavares") and Sergeant Detective Paul Joseph ("Joseph") actively participated in political protests while on duty – a direct violation of BPD Rule 102 § 31[1] –yet neither faced any disciplinary action or even an internal investigation, underscoring the discriminatory and retaliatory treatment directed specifically toward Cottone.

54.  On May 31, 2020 and June 2, 2020, while on duty, Officer Kim Tavares openly participated in political protests at BLM rallies by "taking a knee" in solidarity with the protesters without facing any disciplinary action or investigation.

55.  Joseph publicly criticized the BPD using racially charged language, describing it metaphorically as a "plantation," and faced no disciplinary action or investigations.

56.  Defendants' actionable conduct complained of herein proximately caused Cottone to suffer grave and substantial pecuniary damages, including lost wages, fringe benefits, vacation pay, as well as other pecuniary damages, now, and in the future.

57.  Defendants' actionable conduct complained of herein forced Cottone to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a loss of income, fear regarding Cottone ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

58.  The conduct of each Defendant warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse subjected Cottone to discriminatory terms and conditions of employment based on her and religion, and illegally retaliated against Cottone for exercising her first amendment rights, thereby demonstrating each Defendants' reckless and callous indifference to Cottone's right to work in an environment free from unlawful discrimination, and demonstrating each Defendants' malice or ill will.

59.  Defendants stand jointly and severally liable to Cottone for his damages resulting from the Defendants' illegal and wrongful actions complained of herein.

---

[1] BPD Rule 102 § 31 provides in, relevant part, that employees not on leave of absence pursuant to section 32 are prohibited from, inter alia: . . . publicly endorsing or opposing political candidates and/or issues in any way which would cause a reasonable person, having knowledge of the relevant circumstances, to conclude that the employee was acting in his or her official capacity as a member of the Boston Police Department.

## CLAIMS AGAINST DEFENDANT CITY OF BOSTON

### COUNT I
### RELIGIOUS DISCRIMINATION
### VIOLATION OF 42 U.S.C. § 2000e-2(a)

60.    Plaintiff hereby incorporates by reference paragraphs 1-59 of this Amended Complaint as though fully set forth herein.

61.    Cottone requested from her employer a religious exemption for the mandatory COVID-19 vaccine due to a sincerely-held religious belief.

62.    After learning that Cottone had requested a religious exemption for the mandatory COVID-19  vaccine due to a sincerely-held religious belief, the BPD began to subject Cottone to unfair treatment, including trumped-up investigations by the BPD Internal Affairs Department.

63.    Defendant City of Boston subjected Cottone to multiple adverse employment actions because of her sincerely held religious belief, that ultimately led to her termination, in violation of 42 U.S.C. § 2000e-2(a) and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 56-58 above.

### COUNT II
### RELIGIOUS DISCRIMINATION
### VIOLATION OF MASS. GEN. LAWS c. 151B

64.    Plaintiff hereby incorporates by reference paragraphs 1-63 of this Amended Complaint as though fully set forth herein.

65.    Cottone requested from her employer a religious exemption for the mandatory COVID-19 vaccine due to a sincerely-held religious belief.

66.    After learning that Cottone had requested a religious exemption for the mandatory COVID-19  vaccine due to a sincerely-held religious belief, the BPD began to subject Cottone to unfair treatment, including trumped-up investigations by the BPD Internal Affairs Department.

67.    The BPD subjected Cottone to multiple adverse employment actions because of her sincerely held religious belief that ultimately led to her termination, in violation of Mass. Gen. Laws. ch. 151B and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 56-58 above.

## COUNT III
## RETALIATORY DISCHARGE
## VIOLATION OF 42 U.S.C. § 2000e-3(a)

68.    Plaintiff hereby incorporates by reference paragraphs 1-67 of this Amended Complaint as though fully set forth herein.

69.    On January 2, 2022, Cottone commenced the filing of an MCAD administrative charge alleging religious discrimination.

70.    Cottone was very vocal in the workplace that she was alleging her employer was discriminating against her based on her sincerely held religious beliefs.

71.    Cottone's direct supervisor Greeley began to mistreat her due to her refusal to take COVID-19 vaccine due to her firmly-held religious belief calling her actions "stupid."

72.    Cottone reasonably and in good faith believed that she was being illegally discriminated against based on her religion.

73.    In April 2022, Defendant City of Boston filed criminal charges against Cottone for violating a noise ordinance that only provided for civil penalties.

74.    The criminal charge was ultimately dismissed for lack of probable cause.

75.    Cottone was the only protester who was charged with violating the noise ordinance.

76.    On March 13, 2023, the Defendant City of Boston terminated Cottone's employment for violating departmental rules.

77.    However, numerous other officers who committed significantly more severe offenses have consistently received far less severe disciplinary actions, highlighting the retaliatory and pretextual nature of the charges against her.

78.    Despite Cottone's performance of her assigned duties in an exemplary and professional manner at all times during the course of her employment with Defendant, because she participated in protected conduct by filing an MCAD administrative charge, Defendant unlawfully terminated Cottone's valuable employment in violation of 42 U.S.C. § 2000e-3(a), and as a direct and proximate result of such illegal conduct, Cottone has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Cottone for the damages more fully alleged in paragraphs 56-58 above.

## COUNT IV
## RETALIATORY DISCHARGE
## VIOLATION OF MASS. GEN. LAWS c. 151B

79.  Plaintiff hereby incorporates by reference paragraphs 1-78 of this Amended Complaint as though fully set forth herein.

80.  On January 2, 2022, Cottone commenced the filing of an MCAD administrative charge alleging religious discrimination.

81.  Cottone was very vocal in the workplace that she was alleging her employer was discriminating against her based on her sincerely held religious beliefs.

82.  Cottone's direct supervisor Greeley began to mistreat her due to her refusal to take COVID-19 vaccine due to her firmly-held religious belief calling her actions "stupid."

83.  Cottone reasonably and in good faith believed that she was being illegally discriminated against based on her religion.

84.  In April 2022, Defendant City of Boston filed criminal charges against Cottone for violating a noise ordinance that only provided for civil penalties.

85.  The criminal charge was ultimately dismissed for lack of probable cause.

86.  Cottone was the only protester who was charged with violating the noise ordinance.

87.  On March 13, 2023, the Defendant City of Boston terminated Cottone's employment for violating departmental rules.

88.  However, numerous other officers who committed significantly more severe offenses have consistently received far less severe disciplinary actions, highlighting the retaliatory and pretextual nature of the charges against her.

89.  Despite Cottone's performance of her assigned duties in an exemplary and professional manner at all times during the course of her employment with Defendant, because she participated in protected conduct by filing an MCAD administrative charge, Defendant unlawfully terminated Cottone's valuable employment in violation of Mass. Gen. Laws. ch. 151B, and as a direct and proximate result of such illegal conduct, Cottone has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Cottone for the damages more fully alleged in paragraphs 56-58 above.

## COUNT V
## FIRST AMENDMENT RETALIATION
## VIOLATION OF 42 U.S.C. § 1983

90.   Plaintiff hereby incorporates by reference paragraphs 1-89 of this Amended Complaint as though fully set forth herein.

91.   At all relevant times to this matter, Cottone was employed by a public employer.

92.   On many occasions, Cottone expressed opinions concerning and protested about matters of a public concern — the COVID-19 vaccine mandate.

93.   On many occasions, Cottone expressed opinions about the COVID-19 vaccine mandate as a private person outside of the workplace.

94.   While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as a police officer.

95.   While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as a member of the Boston Police Department.

96.   While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as an employee of the City of Boston.

97.   While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not reference any matters pertaining to her workplace, supervisors or co-workers.

98.   While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not reference any matters pertaining to her position as a police officer, the BPD or the City of Boston.

99.   By protesting the COVID-19 vaccine mandate, Cottone was speaking as a citizen on matters of public concern.

100.  The protesting of the COVID-19 vaccine mandate is political speech protected under the First Amendment to the United States Constitution.

101.  No BPD police officer ever complained to the BPD or the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

102.  No BPD police officer ever refused to work with Cottone or requested that they not be assigned to work with her because of her position against the COVID-19 vaccine mandate.

103. No City of Boston employee ever complained to the BPD or to the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

104. No member of the public ever complained to the BPD or the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

105. On March 13, 2023, the City of Boston, terminated Cottone's employment by a letter issued by BPD Commissioner Cox ("Cox").

106. Cottone's speech was a substantial or motivating factor in the City of Boston's decision to terminate her.

107. Because there were no complaints by any police officers, City of Boston employees or members of the public about Cottone's position against the COVID-19 mandate in which Cottone commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

108. Accordingly, Cottone's speech outweighed any interest that the City of Boston would have in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston could not have an adequate justification for terminating Cottone.

109. Cox, as the BPD Commissioner, is the executive head of the BPD and is responsible for the management, planning, direction, and control of the BPD.

110. At all times relevant to this matter, the disciplinary process at the BPD is that police officers cannot be disciplined, including terminated, unless the BPD Commissioner ratifies it.

111. When the City of Boston terminated Cottone, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

112. The reasons the City of Boston has provided for terminating Cottone – violation of departmental rules – is not believable and, therefore, pretext because there have been many other City of Boston police officer who have committed worse infractions, but whom received little to no discipline.

113. And because Cottone's injury was caused by a person with final policymaking authority – Cox, who was the Commissioner of the BPD at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, the City of Boston is liable.

114. Defendants conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff has been harmed thereby.

## CLAIMS AGAINST DEFENDANT MICHELLE WU

**COUNT VI**
**VIOLATION OF 42 U.S.C. § 1983**
**FIRST AMENDMENT RETALIATION**

115. Plaintiff hereby incorporates by reference paragraphs 1-114 of this Amended Complaint as though fully set forth herein.

116. At all relevant times to this matter, Cottone was employed by a public employer.

117. On many occasions, Cottone expressed opinions concerning and protested about matters of a public concern — the COVID-19 vaccine mandate.

118. On many occasions, Cottone expressed opinions about the COVID-19 vaccine mandate as a private person outside of the workplace.

119. While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as a police officer.

120. While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as a member of the Boston Police Department.

121. While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not identify herself as an employee of the City of Boston.

122. While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not reference any matters pertaining to her workplace, supervisors or co-workers.

123. While speaking and protesting against the COVID-19 vaccine mandate as a private person outside of the workplace, Cottone did not reference any matters pertaining to her position as a police officer, the BPD or the City of Boston.

124. By protesting the COVID-19 vaccine mandate, Cottone was speaking as a citizen on matters of public concern.

125. The protesting of the COVID-19 vaccine mandate is political speech protected under the First Amendment to the United States Constitution.

126. No BPD police officer ever complained to the BPD or the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

127. No BPD police officer ever refused to work with Cottone or requested that they not be assigned to work with her because of her position against the COVID-19 vaccine mandate.

128. No City of Boston employee ever complained to the BPD or to the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

129. No member of the public ever complained to the BPD or the City of Boston about Cottone's position against the COVID-19 vaccine mandate.

130. On March 13, 2023, the City of Boston, terminated Cottone's employment by a letter issued by BPD Commissioner Cox ("Cox").

131. Cottone's speech was a substantial or motivating factor in the City of Boston's decision to terminate her.

132. Because there were no complaints by any police officers, City of Boston employees or members of the public about Cottone's position against the COVID-19 mandate in which Cottone commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

133. Accordingly, Cottone's speech outweighed any interest that the City of Boston would have in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston could not have an adequate justification for terminating Cottone.

134. Cox, as the BPD Commissioner, is the executive head of the BPD and is responsible for the management, planning, direction, and control of the BPD.

135. At all times relevant to this matter, the disciplinary process at the BPD is that police officers cannot be disciplined, including terminated, unless the BPD Commissioner ratifies it.

136. When the City of Boston terminated Cottone, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

137. The reasons the City of Boston has provided for terminating Cottone – violation of departmental rules – is not believable and, therefore, pretext because there have been many other City of Boston police officer who have committed worse infractions, but whom received little to no discipline.

138. And because Cottone's injury was caused by a person with final policymaking authority – Cox, who was the Commissioner of the BPD at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, the City of Boston is liable.

139. Defendants conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

140. When the City of Boston terminated Cottone, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

141.   On March 4, 2022, Mayor Wu appeared on the Dan Rea radio show and referred to Boston First Responders United as a "right wing extremist group."

142.   During the radio show, Cottone called in and Mayor Wu acknowledge that she knew Cottone and had observed her protesting at her personal residence.

143.   Defendant Wu also chided Cottone for protesting too early in the morning even though there was no ordinance in place at the time restricting protests at 7:00 AM.

144.   Mayor Wu's administration sent an email to the BPD with a list of Defendant Wu's vocal critics that included Cottone and other COVID-19 vaccine protesters.

145.   Prior to terminating Cottone on March 13, 2023, Cox and Mayor Wu were aware that Cottone's anti-COVID-19 mandate position constituted protected speech under the First Amendment to the United States Constitution.

146.   It was not objectively reasonable for Defendant Wu to believe that she and Defendant City of Boston's unconstitutional, wrongful, tortious and negligent course of conduct concerning Cottone was legally permissible in light of legal rules in existence at the time of the conduct.

147.   It was not objectively reasonable for Defendant Wu to believe that her actions were permissible under law.

148.   Defendant Wu is not entitled to immunity or qualified immunity regarding her unconstitutional, wrongful, tortious and negligent course of conduct concerning Cottone complained of herein while acting under color of state law, because her conduct was clearly prohibited by federal law at the time, and it was clearly prohibited by reference to common standards of fairness, fair play and due process, and it was objectively and legally unreasonable in light of the legal rules clearly established at the time of the conduct.

149.   Defendant Wu stand personally liable to Cottone pursuant to 42 U.S.C. § 1983 based upon her personal involvement and direct participation in the unconstitutional course of conduct concerning Cottone complained of herein while acting under color of law and under pretense of law.

150.   Defendant's conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

151.   The public interest has been harmed by the Defendant's unlawful actions against Cottone.

WHEREFORE, Plaintiff has been harmed thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SHANA COTTONE prays that this Honorable Court grant her the following relief:

1.      An order directing Defendant City of Boston to place Plaintiff in the position Plaintiff would have occupied but for Defendants' unlawful treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful treatment, including, but not limited to, lost wages, employment benefits, including an order requiring that Defendant reinstate Plaintiff to an appropriate position without further violation of her rights or retaliation;

2.      A finding that the Defendants stands joint and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count herein, including inter alia damages for personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to her professional and personal reputations, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses;

3.      A finding that the Defendants stand joint and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of her religion and disability and retaliated against her for engaging in protected conduct, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

4.      An order declaring that the acts and practices complained of herein are in violation of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; and Mass. Gen. Laws c. 151B.

5.      A permanent injunction against Defendants prohibiting future acts of discrimination against Plaintiff and similarly-situated employees;

6.      An order enjoining and permanently restraining Defendants from further violations of the 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; and Mass. Gen. Laws c. 151B.

7.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

8.      A finding that the doctrine of qualified immunity is inapplicable to Defendants Wu and that she is personally liable to Cottone;

9.      A finding that Defendants stand joint and severally liable to Plaintiff for an award of her
        reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-
        trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to
        Defendants, along with a determination of Plaintiff's litigation costs and expenses taxable to
        Defendants;

10.     An appropriate award of pre-judgment interest at the state rate of twelve percent (12%) per
        annum on all sums recovered; and

11.     Such other and further relief as this Court deems just and proper.

**Demand for Jury Trial**

Plaintiff claims trial by jury on all issues so triable.

Plaintiff
SHANA COTTONE
By Her Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO#: 657622)

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02903
(401) 277-2030 (office)
(401) 487-6666 (cell)
(401) 274-2780 (fax)
mark@markgagliardilaw.net

Date:  June 3, 2025

**CERTIFICATION OF SERVICE**

I hereby certify that on this **3rd** day of June, 20**25**, I filed electronically this document with
the ECF system of the United States District Court for the District of Massachusetts and, therefore,
all counsel-of-record have received notice electronically.

/s/Mark P. Gagliardi
Mark P. Gagliardi